## ALEX. McCULLOUGH v. FRANK MANNING.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS
NO. 2 OF PHILADELPHIA COUNTY.

Argued January 9, 1890—Decided January 20, 1890.

(*a*) An agreement for the sale of land described it by boundaries which
were plainly marked and known to both parties, but stated that it had
a frontage on a river of "138 feet, more or less." Neither of the par-
ties knew or took the trouble to ascertain definitely the frontage line,
although it was afterwards ascertained to be but 123 feet.

(*b*) The agreement provided that a wharf in course of erection should be
completed, with certain facilities ready for the business of the vendee,
within thirty days, under a penalty of $10 per day for each day's de-
fault; but there was no evidence that the vendee could not have gone
into possession and engaged in the business contemplated within the
time limited:

1. In a proceeding by the vendee by bill in equity for specific perform-
ance, there being neither misrepresentation nor warranty as to the
river front, the vendee was not entitled to a decree allowing compen-
sation for the loss of the river frontage, or damages for delay in the
completion of the wharf.

Before STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM
and MITCHELL, JJ.

No. 331 January Term 1889, Sup. Ct.; court below, No. 60
March Term 1887, C. P. No. 2, in Equity.

On April 30, 1887, Alexander McCullough filed a bill in
equity against Frank Manning, in which he averred in sub-
stance:

That on and prior to June 26, 1886, the defendant Frank
Manning, was the owner of a certain lot of ground in the city
of Philadelphia, situate at the foot of Peltz street, and described
as follows: Commencing at the south line of the United States
arsenal; thence extending by that boundary line to low-water
mark in the river Schuylkill; thence along the low-water mark
138 feet, more or less, to a point in the boundary line between
the property late of James Pitts and Washington Hursh;
thence east along this boundary line to the west line of Schuyl-
kill avenue; thence across Schuylkill avenue to the east line

thereof; thence north along the east line of Schuylkill avenue aforesaid, according to the plan and survey of the city of Philadelphia, to the south boundary line of the United States arsenal; thence crossing Schuylkill avenue to the place of beginning.

That on or about June 26, 1886, the said defendant agreed to sell to the plaintiff and he agreed to purchase the said lot, together with all of his rights in the bed of the street, for the sum of $10,000, payable $500 on the execution of the agreement, and the remaining sum to be secured on the property by a ground-rent to run for 20 years, payable principal and interest in gold coin at 5 per cent, for the first ten years, and 6 per cent for the remaining ten, with covenant not to pay off for 20 years.

That in said agreement the defendant further agreed to have the bulkhead in front of the said property finished, and to deliver to plaintiff receipted bills for the same, and after the track of the Schuylkill River East Side R. Co. should be laid, to procure the privilege of a switch connection with same for plaintiff; and, further, that said wharf should be finished, ready for business, within thirty days from the date thereof, and to pay plaintiff $10 for each and every day exceeding said thirty, until the wharf should be finished.

That said $500 was paid June 28, 1886.

That said premises were represented to plaintiff at the time of the execution of said agreement to be 138 feet in front on low-water mark, and were so described at 138 feet, more or less, therein; whereas plaintiff had since ascertained that said premises were but at most 123 feet. That its value consisted in its availability as a wharf property, and was greatly lessened by its frontage being only 123 feet, instead of 138 feet, as represented and described.

That plaintiff was advised that he was entitled to compensation from the defendant for this deficiency, and claimed a deduction of 15–138ths of the price, or such other proportion thereof as might be just and equitable.

That defendant had not finished the bulkhead nor delivered the receipted bills, nor procured the privilege of the switch connection, although the railroad had been long constructed; nor finished the wharf upon the property, nor furnished the

Statement of Facts.

same to plaintiff ready for business, but in these and other respects had failed, neglected and refused to comply with said agreement.

That said neglect and refusal had seriously injured plaintiff in his business, and subjected him to great inconvenience and expense in this:

That plaintiff, when the agreement was made, was engaged in the manufacture and sale of kindling wood on Catharine street wharf, leased for that purpose. That relying upon said agreement he gave up the lease of said Catharine street wharf, and afterwards, being unable to obtain possession of the premises under said agreement, he was obliged to enter into a new arrangement for the transaction of his business, and to pay thereunder fifteen cents a cord for every cord of wood landed at Catharine street wharf, and be put to serious vexation and annoyance in his business. That relying upon the performance of said agreement he purchased certain machinery, intending to place it on the premises described, and had been obliged to keep it on storage and unable to use it. That at the time of the agreement he had a lease of the premises Nos. 1607, 1609, Carpenter street, and used the same in his business, and there had certain machinery which he desired to sell, and place the new machinery on the premises purchased from defendant. That one Andrew Robinson had offered to purchase, but as plaintiff could not get possession of the lot aforesaid, he lost the sale thereof.

That plaintiff was ready to execute the said deed as soon as defendant had complied with his said agreement, and thereupon he prayed: 1. For specific performance. 2. That defendant be decreed to pay the sum of $10 for each day after said thirty days, to the date of his complying with his agreement. 3. The plaintiff's damages caused by the non-performance of said agreement. 4. That defendant be decreed to execute the deed, making allowance and compensation for the difference between the length of the frontage as agreed, and its actual length.

To this bill the defendant made answer admitting that he was owner of the lands described in the bill, had made the contract as alleged, and that plaintiff had paid the $500; and averred that the bulkhead was built, and the receipted bill

Master's Report.

ready to hand to the plaintiff upon the execution of the deed by him; that the switch connection had not been made, as the track of the Schuylkill River East Side railroad, to which it was attached, had not been laid; that when he agreed to finish the wharf in thirty days, under penalty, it was also stipulated in the agreement that the plaintiff was to make to him a ground-rent deed for the property, but had not done so, although often requested, notwithstanding that the defendant had long before executed it; that the bulkhead was actually built and subsequently carried away by a freshet, and had since and before the filing of the bill been rebuilt; that the river frontage of the lot is about 123 feet, but that he never represented it to be 138 feet ; that plaintiff informed his agent that he, plaintiff, had examined the property and the information of the frontage was obtained from plaintiff and there never was any warranty of frontage ; that he had no knowledge of plaintiff's allegation of direct loss by failure to perform the contract, and called for proof of same, if material, but averred it was not; that the stipulations to be performed by the defendant under the agreement were not intended or meant to be conditions precedent to the performance by plaintiff of the stipulations by him agreed upon to be done ; that defendant was and had at all times been ready and willing to carry out his agreement upon the plaintiff complying on his part; and prayed to be dismissed with his costs.

The cause being put at issue, it was referred to *Mr. Wm. F. Johnson*, as examiner and master, who reported·as follows:
From the testimony the master reports the following
FINDINGS OF FACT.

The plaintiff, in June, 1886, was engaged in the business of dealer in kindling wood at Nos. 1607 and 1609 Carpenter street, and rented storage room for the receipt of his wood on Catharine street wharf, Schuylkill. How long he had been engaged did not appear, but his business was established. In June, 1886, the Schuylkill River East Side railroad was in course of construction, and the plaintiff, desiring to enlarge his business, looked about him for a suitable place to purchase and locate. In his search he came across the property of the defendant, and opened negotiations about June 1st, looking to

its purchase.  At this time the embankment of the railroad crossing the lot had been constructed, and the bulkhead intended to enclose it was in course of erection and was about half way up.

The lot is at the foot of Peltz street, which runs along the south wall of the United States arsenal from Gray's Ferry road a distance of 1,044 feet, on a grade amounting to 27.29 feet in that distance.  A half block to the south, and running parallel with Peltz street, at nearly the same grade and for about the same distance, is Alter street.  Neither of these streets is culverted, and they both drain naturally to this lot, and prior to the construction of the bulkhead and the filling in, the surface water poured over a portion of the lot.  At the time of the negotiations aforesaid, the lot was all below grade and only the part along the northern boundary was not marshy ; so that the construction of the bulkhead and the filling in of the lot alone made it fit for business purposes.

The plaintiff never met the defendant; all his negotiations were made with Joseph D. Ellis, the defendant's agent, and he had several interviews with him.  In these negotiations, the plaintiff was aided by an experienced friend, Elijah Register. On June 26, 1886, the negotiations terminated in the agreement that the defendant should sell to plaintiff the lot for the sum of $10,000, $500 to be paid cash and the balance, $9,500, to be secured by ground-rent to run twenty years, principal and interest payable in gold coin at the rate of five per cent per annum for the first ten years, and six per cent for the remaining ten years, the deed to contain a covenant that the rent should not be paid off for twenty years, that defendant should finish the bulkhead and deliver to plaintiff receipted bills for same, and, after the tracks of the railroad were down, to procure the privilege of switch connection with the same.

Whether before or after these details were agreed upon, or simultaneous therewith, does not distinctly appear, but at this meeting the frontage of the lot was referred to, and Mr. Register asked Mr. Ellis what it was.  Mr. Ellis took a map of surveys belonging to the railroad company, and with a graduated scale scaled it off and made the lot 140 feet on low-water mark.  Mr. McCullough said he did not think it was that much, and Mr Ellis scaled it again, making it 138 feet, and

told him he would get all there was there and he would get neither more nor less. Then Mr. Ellis dictated the agreement embodying the said understandings and agreements and describing the property therein by physical points and lines without mention of distances by feet and inches, excepting the low-water line, which he mentioned as 138 feet, more or less, the result of his scaling the map in the presence of the plaintiff and Mr. Register, and adding thereto an agreement that the wharf should be finished ready for business within thirty days under a penalty of $10 for each and every day exceeding the thirty days.

The German-American Title and Trust Company was selected by the plaintiff as his conveyancer, and the agreement was executed at its office. To this agreement was appended a plan of the property taken from the old agreement made between the defendant and his vendor. Upon this plan, Mr. Ellis marked in lead pencil the figures "138" to designate the front on low-water mark, and other memoranda unnecessary to the solution of the point in controversy.

The work upon the bulkhead was continued, and when nearly completed, part of the cribbing slipped out into the river. As much of it was removed as could be, down to low-water, and the bulkhead was reconstructed, leaving what could not be recaptured resting where it slipped. When this happened no one could tell precisely, the best evidence being, about the latter part of August, 1886. In rebuilding, the construction was made on the established line, which left part of the old cribbing projecting into the river at about low-water line at the south end of the property, 3 feet in its greater projection, and 2 feet 7 inches at its narrowest beyond the ordinance piece (the string piece on top, or cap-log), and in length 5 feet 6 inches.

The plaintiff does not appear to have done anything towards perfecting his agreement. In August he complained to Mr. Ellis of the slowness of his conveyancer and the delay in getting the wharf ready; and it was in this month, he says, he ascertained that the front was not 138 feet and was but 123 feet. By actual measurement it is but 122 feet.

At or about this time Mr. Ellis told him, plaintiff, that he could go ahead and get his buildings up at any time, and of-

fered to give him a lot of old material to assist him. This he
did not do. Mr. Ellis then and afterward requested him to
sign the deeds, but he did not do so, and after waiting upon
the conveyancer several times, Mr. Ellis finally got the deeds
on October 6, 1886, and defendant executed them. Plaintiff
was notified that the defendant had executed them, and was
requested to do likewise, but he never did, and in November
he refused to sign the deed until the lot was graded in a man-
ner satisfactory to him.

The plaintiff contended that he was entitled to have a de-
cree of specific performance of the agreement with an allow-
ance of 16–138ths of the price of the lot, by reason of the same
not being 138 feet on low-water line as mentioned in the agree-
ment, but only 122 feet; and a further abatement of the price
at the rate of $10 per day from July 26, 1886, the expiration
of the thirty days from the date of the agreement, as liquidated
damages; that the lot should be entirely filled in to grade and
graded; that the bulkhead should be reconstructed, or reme-
died in respect of the said fault, and that the defendant should
be compelled to furnish the privilege of switch connection with
the railroad siding.

### CONCLUSIONS OF LAW.

The inquiry of the master is directed to two points only, as
they embrace the whole controversy, and their intelligent solu-
tion will settle the minor matters involved. They are: 1. Was
there a warranty of frontage on low-water mark? 2. What
was the agreement in respect to finishing the wharf, ready
for business, within thirty days from the date of the contract?

1. The plaintiff testified that he did not know the frontage,
yet admitted having seen the lot, and doubtless had been there
many times. In the office of Mr. Ellis, when he, the plaintiff,
and Mr. Register were present, and the frontage of the lot was
spoken of, and Mr. Ellis got down the plan and scaled it, did
he do more in announcing the result than either of the others
could have done? Did that incident have anything whatever
to do with determining the plaintiff to purchase? Or, had not
the remark of Mr. Ellis that he would get all there was there,
no more, no less, quite as much to do with it? Or, indeed,
did not the plaintiff go with the intention of buying, and was
not the remark in reference to the frontage mere unnecessary

talk? And did not the vendor know what he was selling and the vendee what he was buying?

These were questions that presented themselves to the master, but he felt that there was some sincerity in this claim of the plaintiff by the earnestness in which it was put by the learned counsel for the plaintiff and the testimony adduced that the value of the wharf properties depended upon the frontage, and that the plaintiff might have been innocently led into contracting at the price he did predicated of the 138 feet of frontage mentioned, and he gave great care to the incident testified to where the frontage was mentioned and how ascertained. In addition thereto he went upon the property and examined it. He found nothing there that would induce the more ordinary buyer to inquire the frontage except from curiosity. The south wall of the arsenal forms part of the northern line, and it, projected to the river, forms the whole line; and the centre line of the back alley to the Alter street houses, projected, forms the south line. These two lines are as well marked as they would be without fencing in the lot, and culpable stupidity alone could be pleaded for not observing the same; besides, they are old-established lines, and no one interested could be in ignorance of them.

Again, let us look at the description in the agreement: "Commencing at the south line of the United States arsenal; thence extending by that boundary line to low-water mark; thence along the low-water mark 138 feet, more or less, to a point in the boundary line of James Pitts and Washington Hursh; thence east along this boundary line," etc. Is there any doubt that the intent of both parties was to include all the property from the arsenal line to the Pitts-Hursh line? The master does not think there is. That is what the defendant sold and the plaintiff bought; no more, no less; and it was that the defendant was always ready to convey. The plaintiff knew he was buying the old Hanbest lot, and it does not lie in his mouth now to plead any ignorance thereof. The lines were there to see, and the number of feet between them was no moving cause to the contract.

It is idle, in face of these facts and findings, to quote decisions on the failure of quantity. The books are full of them, but no case can be found where any allowance was ever made

where natural boundaries, or established lines known to both vendor and vendee, were mentioned, or where both parties, as in this case, knew exactly what was being sold and purchased. For these reasons the master, without hesitation, rejects this claim of the plaintiff, and decides that there was no guaranty of frontage on low-water mark.

2. The contract on the part of defendant was, " that the said wharf shall be finished, ready for business, within thirty days from the date hereof." The " business " contemplated was that in which the plaintiff was engaged, and the clause meant no more than that the wharf should be ready for the plaintiff to receive his cord-wood there, to store it, and to erect a kiln where it could be dried, that he and his servants could go upon it with his horses and carts, and there transact *his* business.

There is no testimony to show that the plaintiff could not have gone on to the wharf, received his wood, stored it, erected his kiln and transacted his business there, in the latter part of August, 1886, or within a brief time thereafter. On the contrary, Mr. Ellis then requested him to go on and put up his building, and offered to assist him with a gift of some material that could have been used by him. The plaintiff had done nothing up to this time that would have justified any complaint on his part of the tardiness of defendant. He had chosen his own conveyancer, and his deed had not yet been prepared, yet the defendant was willing to let him go on and erect his building.

A great deal of the evidence was presented to show the effort on the part of the defendant to fully fill in the lot and grade it, and on the part of the plaintiff to show that it was not yet filled in, which was not the point at issue at all. The simple point was : Was the wharf in such condition within thirty days after the making of the contract, or within such reasonable time thereafter as plaintiff himself was ready to perform his contract, for the plaintiff to transact his business thereon ? All the testimony points that way, and the master finds such to be the fact; and hence he decides that there is no necessity whatever in the case to go into the discussion of whether the claim in the agreement respecting the $10 a day is a penalty or liquidated d⸰ ages. In neither event would the plaintiff be entitled t⸰ thing.

The master feels that no respect whatever should be paid, in view of all the facts, to the enormous claim of plaintiff. Were it allowed him, the price of the property for which he deliberately and after long consultation agreed to pay $10,000, would be reduced to $2,100; an absurdity, unless he was really and in fact damaged. He would not sign the deed until the whole lot was graded to his satisfaction, yet there was no such agreement. Again, he says the wharf cannot be used by reason of the piece of the old crib still being 3 feet, or thereabouts, projecting into the river at low-water mark for 5 feet 6 inches of the lower part of the bulkhead, and that boats cannot lie there without danger of being cut and sunk. This is certainly not so; there are 117 feet that could be used, and the probability of injury to a vessel, even if she was moored at this point, is very remote indeed.

It is very manifest that these points were pressed to induce the inforcement of an apparent penalty. The plaintiff evidently thought that he was to do nothing whatever, wait until the whole wharf was graded to suit him, the bulkhead in perfect condition and the deed tendered him for signature, and receive $10 a day for every day he waited. Nothing so much shows the indifference of plaintiff and his lack of communication with the defendant as the question of the switch. Never a word seems to have been said about it, and the defendant thought he wanted it on the west side of the railroad, when he really wanted it on the east side, a matter that could have been settled by a word. However, that is eliminated from the discussion, as the grant has been made.

3. These two questions being disposed of, there remains in the controversy another matter raised by the testimony, of importance to both of the parties.

It is reasonable to suppose that the plaintiff believed he was to have the whole lot filled in to the limits of his line and properly graded; and such manifestly was the belief of the extent of the obligation on the part of the defendant, by Mr. Ellis. This is altogether another question than having the wharf ready for the plaintiff's business. The defendant's testimony showed that he finished the filling-in by Thanksgiving Day of 1886, or, by the railroad engineer, the latter end of December, 1886. Of course the condition of the lot now, will not show its position

with reference to grade then, as it is quite obvious that the material has settled and will continue to settle for some time; and until Peltz and Alter streets are culverted, there will be continual difficulty with the surface water which runs down those streets at the heavy grade mentioned. But that was patent before the making of the contract. The surveyor testified that it would require 2,000 cubic yards of dirt to bring the lot up to what should be grade, no official grade having as yet been established. It is the opinion of the master that this should be done at once by the defendant with as little inconvenience as possible to the business of the plaintiff, should he elect to go on and occupy the premises immediately.

The duty of the defendant also exists to remove the old cribbing that slipped into the river, and as this can be done without any inconvenience to the plaintiff, it should be done without further delay.

A decree having been recommended in accordance with the foregoing report, the plaintiff filed twenty-four exceptions, some of them relating to the master's findings of fact, and others to his conclusions of law. The defendant also filed exceptions. These exceptions having been overruled by the master, were renewed before the court on the filing of the report. After argument, they were dismissed, the master's report confirmed, and the decree recommended by the master entered as follows:

And now, this fifth day of January, A. D. 1889, the said cause coming on to be heard, on the exceptions filed by the plaintiff and defendant to the master's report, and the same being argued, it is ordered, adjudged and decreed that the said exceptions be dismissed and the report of the master be and the same is hereby confirmed. It is further ordered that the said plaintiff shall and do, upon presentation to him of the ground-rent deed now held in escrow executed by the defendant, sign, seal and deliver unto the said defendant the deed of conveyance and reservation of the ground-rent in conformity with the agreement in the bill mentioned, and that they make a settlement with respect of purchase money for the property in question as of the first day of November, A. D. 1886. And it is further ordered and decreed that the said defendant shall forthwith and without any unnecessary delay fill in the lot in

Opinion of the Court

question, where needed, to the grade given by the district surveyor; and shall also within thirty days remove that part of the cribbing of the bulkhead which projects into the river, or if that be found impracticable, he shall within the same time drive piles in front of the same and within the port warden's outer line, and thus enclose the obstruction and finish the bulkhead in conformity to the remaining part of the bulkhead in question. And that the defendant pay the costs of his suit.[25]

Thereupon the plaintiff took this appeal, specifying that the court erred: 1–24. In dismissing the plaintiff's exceptions to the master's report. 25. In entering the foregoing decree.[25]

*Mr. J. M. Gest* (with him *Mr. W. P. Gest* and *Mr. John Sparhawk, Jr.,*) for the appellant.

Counsel cited: (1) Smith v. Evans, 6 Binn. 102; Kreiter v. Bomberger, 82 Pa. 59; Wilson v. Randall, 67 N. Y. 338; Triplett v. Allen, 26 Gratt. 721 (21 Am. Rep. 320); Hill v. Buckley, 17 Ves. 395; Erwin v. Myers, 46 Pa. 107; Napier v. Darlington, 70 Pa. 67. (2) Streeper v. Williams, 48 Pa. 450; Powell v. Burroughs, 54 Pa. 329; Wolf Creek etc. Co. v. Schultz, 71 Pa. 180; Fox v. Snyder, 9 Phila. 285; Mathews v. Sharp, 99 Pa. 560. (3) Bispham's Eq., § 396; Freeson v. Bissell, 63 N. Y. 168; Lauer v. Lee, 42 Pa. 165. (4) Howard v. Ingersoll, 13 How. 381.

*Mr. Henry R. Edmunds,* for the appellee.

Counsel cited: Blaney v. Rice, 20 Pick. 62; Cross v. Eglin, 2 B. & A. 110; Wilson v. Randall, 67 N. Y. 338; Paine v. Upton, 87 N. Y. 327 (41 Am. Rep. 371); Durham v. Legard, 34 Beav. 611.

PER CURIAM:

One of the twenty-four exceptions, filed by the plaintiff below to the report of the learned master, relates to the admission of evidence; several of them complain of his findings of fact, and the others relate to his rulings and conclusions of law. Those exceptions were severally overruled by the court below, and that constitutes the subject of complaint in each of the first twenty-four specifications of error, respectively.

There was no error in the admission of the testimony referred to in the twenty-first specification.

Opinion of the Court.

An examination of the evidence returned with the record, aided by able argument of the learned counsel for the appellant, has failed to satisfy us that any of the findings of fact complained of are erroneous. No rule of practice is better settled than that the findings of fact by a master, sanctioned by the approval of the court below, will not be set aside except for plain error: Kisor's App., 62 Pa. 428; Sproull's App., 71 Pa. 137. No such error appears in this case.

There was no error in construing the agreement for the sale of the lot, nor in any of the conclusions drawn from the facts found by the master and approved by the court.

It does not appear that the vendor refused to convey the land described in the agreement as bounded on the north by the south line of the United States arsenal, extended to low-water mark on the Schuylkill river, on the west by the river, and on the south by the "boundary line of James Pitts and Washington Hursh," etc. There could have been no misunderstanding as to the boundary lines of the lot. They were familiar to both of the parties. The only complaint is, that the length of the river front line mentioned in the agreement as "138 feet, more or less," is by actual measurement only 123 feet. For that difference of 15 feet appellant claims a proportionate deduction from the purchase money, on the ground of misrepresentation, etc. The learned master correctly found that there was neither misrepresentation nor warranty as to the width of the river front; that neither of the parties knew or took the trouble to ascertain definitely what the length of the line was. The length, "138 feet, more or less," given in the agreement, was merely an approximate estimate, arrived at by scaling a plot or map of the land. It is unnecessary to refer specially to the evidence bearing on that subject. It fully sustains the conclusions of the master, and shows that appellant's claim to deduction from the purchase money is without merit. The object in giving the length of the river front as "138 feet, more or less," was doubtless to avoid committing the vendor to any specific extent of river frontage.

The remaining specification, complaining generally of the decree, cannot be sustained. The decree is quite as favorable to appellant as the facts of the case warranted.

> Decree affirmed, and appeal dismissed, at the costs of appellant.